## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIO A. AGOSTINI, | : | CIVIL NO: 1:14-CV-02234 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Caldwell) |
| v. | : | |
| | : | |
| CRAIG LOWE, *et al.*, | : | |
| | : | (Magistrate Judge Schwab) |
| Defendants. | : | |

### REPORT AND RECOMMENDATION

In this civil action, proceeding *via* a second amended complaint, the *pro se* plaintiff, Mario A. Agostini ("Agostini"), currently a pre-trial detainee at Pike County Correctional Facility ("PCCF"), raises 42 U.S.C. § 1983 federal constitutional claims against Pike County; PCCF employees and medical staff; and Prime Care Medical, which is PCCF's medical provider. Agostini's claims stem from incidents that occurred at PCCF. Pending are two motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. As set forth below, Agostini's second amended complaint fails to state a claim upon which relief can be granted, and, thus, we recommend that the motions to dismiss be granted.

## I.    <u>Relevant Procedural History.</u>

On November 24, 2014, Agostini initiated this lawsuit by filing a complaint. *Doc. 1.*  Along with the complaint, Agostini filed a motion to proceed *in forma pauperis*, which the Court granted. *Docs. 2 & 12.*  On January 29, 2015, Agostini filed an amended complaint (*Doc. 23*) and named the following defendants: (1) Pike County; (2) Pike County Correctional Facility ("PCCF"); (3) Prime Care Medical, Inc. ("Prime Care"), an entity responsible for providing medical services to the inmates at PCCF; (4) Craig Lowe ("Lowe"), Warden of PCCF; (5) Lieutenant Todd Schweyer ("Schweyer"), Second Shift Lieutenant at PCCF; (6) Mary Keller ("Keller"), Classifications Counselor at PCCF; (7) Terry Mooney ("Mooney"), Programs Counselor at PCCF; (8) Officer Tarkett ("Tarkett"), Correctional Officer at PCCF; (9) Linda Monaghan ("Monaghan"), Nurse for Prime Care; (10) Patty Bunting ("Bunting"), Nurse Practitioner for Prime Care; and (11) Tina Goodwin ("Goodwin"), Nurse Administrator for Prime Care.  The defendants filed two separate motions to dismiss Agostini's amended complaint. This Court granted both motions to dismiss the amended complaint, but Agostini was granted leave to file a second amended complaint by August 31, 2015.

On July 31, 2015, Agostini timely filed a second amended complaint (*Doc. 56*).  This second amended complaint names as defendants many of the same

parties as in the amended complaint, including the following: (1) Pike County;

(2) Lowe; (3) Prime Care; (4) Monaghan; (5) Bunting; and (6) Goodwin, all whom

Agostini sues in their individual and official capacities.  The second amended

complaint, however, omits Schweyer, Keller, Mooney, Tarkett, and PCCF.

Currently before this Court are two separate motions to dismiss Agostini's second

amended complaint for failure to state a claim.  The first (*Doc. 57*) was filed on

August 4, 2015 by Lowe and Pike County jointly, and the second (*Doc. 62*) was

filed on August 14, 2015 by Prime Care, Monaghan, Bunting, and Goodwin

collectively.  Both motions are ripe for this Court's disposition.

## II.   <u>Legal Standard.</u>

Defendants' motions to dismiss are brought pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure.  Rule 12(b)(6) authorizes dismissal of a

complaint for "failure to state a claim upon which relief can be granted."  Under

Rule 12(b)(6), we must "accept all factual allegations as true, construe the

complaint in the light most favorable to the plaintiff, and determine whether, under

any reasonable reading of the complaint, the plaintiff may be entitled to relief."

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v.*

*County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).  While a complaint need

only contain "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), and detailed factual allegations are not required, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). "[L]abels and conclusions" are not enough, and a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoted case omitted).

In resolving a motion to dismiss, we thus "conduct a two-part analysis." *Fowler,* 578 F.3d at 210. First, we separate the factual elements from the legal elements and disregard the legal conclusions. *Id.* at 210–11. Second, we "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoted case omitted). While traditionally focused upon the allegations contained in a complaint, a court may also consider exhibits attached to a complaint, matters of public record, and "an undisputedly authentic document" relied upon by the plaintiff and attached as an exhibit to a defendant's motion to dismiss. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, in a case

4

such as this, a complaint filed by a *pro se* litigant is to be liberally construed and held to a less stringent standard than formal complaints drafted by a lawyer. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  Nevertheless, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

## III.   Agostini's Second Amended Complaint.[1]

Agostini's claims stem from a fall he sustained while attempting to climb onto the upper-tier bunk bed assigned to him at PCCF and the medical treatment he received after that fall.  The material facts alleged in Agostini's second amended complaint, which are substantially similar to those alleged in his amended complaint, are as follows.

### A. Agostini's Fall and Subsequent Medical Treatment.

Agostini had been assigned to a top-tier bunk bed in PCCF, which, according to his estimations, was located five feet above the ground. *Doc. 56* at ¶ 20.  According to Agostini, due to the height of top bunks, they could not be

---

[1]      Consistent with the Rule 12(b)(6) legal standard, *supra,* we will accept Agostini's properly pleaded allegations as true.

accessed simply by crawling into them, and no ladders were provided to the housing unit ("Unit-C") to which he was assigned. *See id.* at ¶¶ 19-20.  Agostini alleges that inmates could not use the housing unit's chairs to access the bunk beds because such an act would constitute misuse of county property and could result in reprimand for the inmates who attempted to do so. *Id*. at ¶ 20.  Thus, for a period of six months, Agostini engaged in a habit of entering his top-tier bunk bed via a desk located within his cell, a technique of bunk entry allegedly suggested by PCCF staff. *See id*. at ¶¶ 20-21.

At approximately 10:50 a.m. on September 13, 2014, Agostini fell off of the desk within his cell while he was attempting to access his top bunk. *Id*. at 21.  Various prison officials and medical staff were immediately informed of Agostini's fall, and multiple prison workers, including Monaghan, came to the housing unit and removed Agostini from the unit on a stretcher without using a neck brace. *Id*. at ¶ 22.  Monaghan then assessed Agostini, who told her that he was "experiencing severe pain in his lower back region." *Id*.  After her assessment, Monaghan requested that Agostini stand up and walk back to Unit-C, and Officer Tully escorted Agostini back to the unit. *Id.* at ¶ 23.  Agostini expressed concern to Tully that despite his complaints of severe lower back pain, Monaghan had elected not to send him to a hospital for X-rays and/or an MRI. *Id*.  Because Agostini took

issue with Monaghan's failure to order any further testing on the day of the fall, he ultimately filed a grievance against Prime Care, Monaghan's employer. *Id*. at ¶ 26.

Upon Agostini's return to Unit-C at 11:05 a.m., Officer Riemer, who was in charge of the unit, was given an order by medical staff to reassign Agostini to a bottom tier bunk bed.  But before Officer Riemer could do so, he was relieved for his lunch break and Agostini was placed back into the same cell in which he had fallen. *Id*. at ¶ 24.  While Riemer was at lunch, Agostini was placed under the supervision of Tarkett who refused to move Agostini to a cell with a lower bunk, stating that he did not feel like dealing with it and telling Agostini he would have to wait until Riemer returned from lunch. *Id*.  Because a lower-tier bunk was unavailable in the cell, Agostini chose to lie on the floor while waiting for Riemer to return. *Id*.  Agostini later filed a grievance against Tarkett, but it was allegedly denied because he filed it after the expiration of the 10-day deadline for filing grievances. *Id*. at ¶ 25.  When Riemer returned from his lunch, a meal cart was brought to the unit, but Agostini was allegedly unable to get himself up because his pain was so severe. *Id*.  At around 12:05 p.m., Agostini was taken in a wheelchair to a different area of the prison to be placed on "Administrative Segregation" for observation until he could be seen by Prime Care Nurse Practitioner Patty Bunting three days later. *Id*.  Three days after the fall, on September 16, 2014, Bunting

examined Agostini, diagnosed him with "soreness of muscles" from his fall, and prescribed Tylenol and muscle relaxers. *Id*. at ¶ 26.  Bunting also advised Agostini that he should start walking, but because he was still experiencing a shooting pain from his lower back to his heel as well as numbness in his thigh, Agostini told Bunting that he wished not to do any walking until an X-ray or MRI was ordered. *Id*.  Bunting agreed to order an X-ray, but refused to order an MRI, as Prime Care would not cover the expense. *Id*.  X-rays were taken on September 18, 2014, and the day after they were taken, Agostini was informed that the X-rays showed no broken bones or other injuries. *Id*. at ¶ 27.

According to Agostini, the Tylenol and muscle relaxers prescribed by Bunting were not alleviating his pain at all. *Id*.  When he complained of this, Prime Care Medical Nurse Administrator Tina Goodwin informed him that he would have to wait until his follow-up appointment with Physician's Assistant (PA) Jenn Mroz on September 23. *Id*.  Agostini continued to experience pain, including an alleged incident on September 22 in which his leg pain became so severe that it caused him to black out, fall, and bump his head. *Id*. at ¶ 28.  After this incident, Goodwin assessed Agostini and ordered that he be placed on intake for observation. *Id.*  Agostini was of the opinion that by now he should have been sent out to a hospital for evaluation. *Id*.

8

On September 23, Agostini had a follow-up appointment with PA Mroz, at which Mroz diagnosed him with sciatica. *Id*. at ¶ 29.  Agostini was taken off the Tylenol and muscle relaxers, and Mroz, instead, prescribed both a nerve pain reliever and an anti-inflammatory medication. *Id*.  In addition, on September 27, "LPN Kim" assigned Agostini a list of stretching exercises to perform. *Id*.  Mroz informed Agostini that this was all that could be done at this point and that it would take some time for Agostini to experience relief. *Id*.  Mroz's diagnosis of sciatica led Agostini to believe that Bunting had earlier misdiagnosed him and that Bunting "was not concerned" with the pain he described when she assessed him earlier. *Id*.

On October 14, 2014, Agostini's prescription nerve pain reliever and anti-inflammatory medication ran out, and he had to "wait in severe pain for two days" until a follow-up appointment with Debra Wilson, M.D. on October 16, which had been rescheduled from October 14, due to Wilson's unavailability. *Id*. at ¶ 30.  At the follow-up appointment on October 16, Doctor Wilson confirmed PA Mroz's earlier diagnosis of sciatica and renewed Agostini's prescriptions for the nerve pain reliever and anti-inflammatory. *Id*.  Several days after the appointment with Doctor Wilson, Agostini requested a dosage increase for his medications, complaining that the pain relief from the current dosages was too "short-lived." *Id*.  Allegedly, the

request was granted, and a prescription was issued for an increased dosage of the nerve pain reliever. *Id.* Since his request for an increased dosage was granted at this time, Agostini believed that Goodwin acted wrongfully in September when she said nothing could be done in response to Agostini's complaint that the Tylenol and muscle relaxers were not alleviating his pain at all. *Id.*

### B. Agostini's Filing of Grievances with PCCF.

On September 25, 2014, after his fall, Agostini allegedly questioned Lieutenant Todd Schweyer regarding PCCF's failure to provide ladders[2] as well as its failure to post instructions informing inmates how to access their upper-tier bunk beds without the use of a ladder. *Id.* at ¶ 32. Schweyer allegedly had no answer for this question, but he approved Agostini's request for a grievance form. *Id.* Agostini filed a grievance, and he allegedly received the same response from Counselor Mary Keller, Counselor Terry Mooney, and defendant Warden Craig Lowe, each of whom denied Agostini's grievance. *Id.* at ¶ 33. The most recent denial of his grievance came from Lowe on October 20, 2014. *Id.* at ¶ 35. In essence, the alleged response by Keller, Mooney, and Lowe was that neither the

---

[2] Although Agostini alleges an unavailability of ladders in his PCCF housing unit, "Unit-C," he does mention in his amended complaint that ladders have been installed on the beds in one of PCCF's other housing units, specifically "Unit-E." *Doc. 23* at ¶ 34.

lack of ladders nor the lack of instructions on how to access top-tier bunk beds should be a concern to Agostini anymore considering he had been transferred to a lower-tier bunk bed. *Id*.  Agostini also filed a Level II medical grievance on September 29, 2014, inquiring as to why more testing had not been done from the outset to diagnose his injuries on the day he fell. *Id*. at ¶ 36.  Agostini complains that the reply he received to this particular grievance was "still not to [his] satisfaction." *Id*.

### C. The Legal Claims in Agostini's Second Amended Complaint.

Agostini argues that the lack of bunk bed ladders, the medical treatment that he received, and the rejection of his grievances amount to violations of his due process rights under the Fourteenth Amendment to the United States Constitution. *Id*. at ¶ 38.  Agostini seeks both injunctive relief and monetary damages. *See id*. at ¶¶ 42-44.  As injunctive relief, he seeks a permanent injunction ordering the following: 1) that ladders be installed on the bunk beds of every housing unit at PCCF; 2) that instructions on how to use the ladders be put in place and added to the inmate handbook or presented in an instructional video; and 3) that all defendants "make a greater effort to clarify matters involving negligence before reaching this level without giving a standard answer or denying the relevance of

inmate issues." *Id*. at ¶ 42.  As monetary damages, Agostini seeks $500,000 in compensatory damages against each defendant jointly and severally, as well as $500,000 in punitive damages against each defendant. *Id*. at ¶¶ 43-44.  In his second amended complaint, Agostini also lists negligence as a separate cause of action, which he did not do in his amended complaint. *Id.* at ¶ 11.

## IV.   **Discussion.**

### A. Constitutional Claims Against Pike County.

A municipality, such as Pike County, can be liable under 42 U.S.C. § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson,* 131 S.Ct. 1350, 1359 (2011) (quoting 42 U.S.C. § 1983).  A municipality, however, cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior.  Monell v. Department of Social Servs.,* 436 U.S. 658, 691 (1978).  To impose liability on a municipality under Section 1983, a plaintiff must demonstrate that an official municipal policy caused his injury. *Connick,* 131 S.Ct. at 1359.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.*

Once a section 1983 plaintiff identifies a municipal policy or custom, he must demonstrate that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997). Where the policy or custom violation is not clear on its face, causation can be established only by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Berg v. County of Allegheny,* 219 F.3d 261, 276 (3d Cir. 2000). In limited circumstances, a municipality's failure to train its employees about their duty to avoid violating citizens' rights may rise to the level of a municipal policy. *Connick,* 131 S.Ct. at 1359. "A municipality' culpability for a deprivation of rights is at its most tenuous [however] where a claim turns on a failure to train." *Id.* A municipality's failure to train must amount to deliberate indifference to the rights of persons with whom the municipal employees come into contact. *Id.* "Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Id.* at 1360 (quoting *Board of Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 410 (1997)). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."

*Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409).   Accordingly, when reviewing a

failure-to-train claim, a court "must adhere to a 'stringent standard of fault,' [so

that] municipal liability under § 1983 [does not] collapse into *respondeat*

*superior.*" *Id.* at 1365 (quoting *Bryan Cnty,* 520 U.S. at 406, 410).

Based on the above governing standard, we conclude that Agostini's

amended complaint fails to state a § 1983 claim upon which relief can be granted

against Pike County.   Agostini presents two lines of argument to allege that

PCCF's failure to provide ladders to his housing unit violates his rights under the

Fourteenth Amendment to the United States Constitution and that Pike County

should thus be held liable.   First, Agostini argues that the "policy" of installing

bunk bed ladders in some housing units but failing to install ladders in other units

is constitutionally deficient on equal protection grounds.   In the alternative,

Agostini alleges that PCCF's failure to provide ladders and its failure to post

instructions for its inmates informing them how to safely access a top-tier bunk bed

without a ladder presents an unreasonable risk of harm, deprives him of a basic

human need, and amounts to deliberate indifference.

When evaluating a pretrial detainee's claims regarding prison conditions,

"the proper inquiry is whether those conditions amount to punishment prior to an

adjudication of guilt in accordance with law.   For under the Due Process Clause, a

14

detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  To determine whether challenged conditions of pre-trial confinement constitute punishment, the Supreme Court has put forth the following analysis:

> [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.  Absent a showing of an expressed intent to punish on the part of the detention facility officials, that determination generally will turn on 'whether [it has] an alternative purpose . . . and whether it appears excessive in relation to [that] purpose . . .'

*Id*. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

Agostini does not allege that the failure to provide ladders was intentionally designed as a punitive measure.  And while there seems to be no case law from this District directly on point with Agostini's ladder complaint, other federal courts within the Commonwealth have suggested that a failure to provide a ladder in a prison cell does not amount to a constitutional violation. *See Williams v. Corizon*, 12-cv-02412, 2013 WL 4787223, at *15 (E.D. Pa. Sept. 9, 2013) (holding that the City of Philadelphia could not be held liable for a constitutional violation for a failure to provide ladders in all bunk beds, as such an omission would be mere negligence and not a constitutional violation); *see also Pumphrey v. Smith*, 1:09-

cv-233, 2010 WL 4983675, at *4 (W.D. Pa. Dec. 2, 2010) ("the lack of a ladder in a prison cell is not a deprivation that reduces Plaintiff's living below 'the minimal civilized measure required.' Plaintiff could crawl into the bunk or utilize a chair and still not be deprived of the minimal necessities of life.").[3] Thus, based on these cases, we conclude that the failure to provide a ladder or instructions on how to enter the bunk, does not amount to a due process violation.

Agostini also presents a separate Fourteenth Amendment equal protection claim. The Equal Protection Clause of the Fourteenth Amendment directs that all similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). Two independent legal theories exist upon which a plaintiff may predicate an equal protection claim: the traditional theory and the class-of-one theory.

---

[3]     Agostini alleges that crawling into his top bunk bed was impracticable due to its distance from the ground (5 feet) and further alleges that utilizing a chair to enter his bunk would violate PCCF policy and subject him to reprimand. Nonetheless, Agostini alleges that the cells in his housing unit contain desks which prison officials encourage inmates to utilize to assist in the access of their top-tier bunks. Considering that in *Pumphrey*, the court found the use of a chair to enter a bunk bed does not amount to a constitutional violation, we do not see how the use of a desk would be significantly distinguishable. While neither a chair nor a desk is specifically designed for climbing and both may present risks of harm, we cannot think of any reasons why use of a desk would be significantly more dangerous than use of a chair and thus give rise to a constitutional violation to which use of a chair does not give rise.

16

The traditional theory protects a plaintiff from discriminatory treatment based on membership in a protected class such as race. *See, e.g., id.; McLaughlin v. Florida,* 379 U.S. 184, 192 (1964).  To assert a protected-class claim, the plaintiff must demonstrate that (1) he or she is a member of a protected class and (2) the government treated similarly situated individuals outside of the protected class differently. *See Oliveira v. Twp. of Irvington,* 41 F. App'x 555, 559 (3d Cir. 2005) (observing that a prima facie case under the Equal Protection Clause requires plaintiffs to prove membership in "a protected class and that they received different treatment than that received by other similarly-situated individuals"). Under this theory a plaintiff "must prove the existence of purposeful discrimination" by the defendants. *Keenan v. City of Phila.,* 983 F.2d 459, 465 (3d Cir. 1992).

Under the class-of-one theory, a plaintiff may advance an equal protection claim absent membership in a protected class if the plaintiff shows that the defendants engaged in irrational and intentional differential treatment of him when compared with similarly situated individuals. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).  This theory allows a plaintiff to assert an equal protection claim regardless of protected class when the government irrationally treats the plaintiff differently from similarly situated individuals. *Id.* at 564; *Hill v.*

17

*Borough of Kutztown,* 455 F.3d 225, 239 (3d Cir. 2006).  To prevail on a class-of-one claim, the plaintiff must demonstrate that: (1) the defendants treated him differently from others similarly situated; (2) the defendants did so intentionally; and, (3) there was no rational basis for the difference in treatment. *Hill,* 455 F.3d at 239.

Upon review of Agostini's amended complaint, we conclude that he has failed to state an Equal Protection claim upon which relief can be granted against Pike County or any defendant for that matter.  Agostini does not allege that he is a member of a protected class, and while PCCF allegedly provides ladders to Housing Unit-E but not to other housing units, Agostini has not alleged facts from which it can reasonably be inferred that Pike County intentionally treated him differently from other inmates without a rational basis.  In this regard, Agostini alleges no facts to suggest that the decision to place the ladders in Unit-E was motivated by a preference for that unit's inmates over inmates of other housing units or Agostini himself.  Nor has he alleged facts from which it can reasonably be inferred that Housing Unit E is arranged in a substantially similar manner as other housing units or that is the same age as other units.  Absent allegations raising a reasonable inference of discriminatory intent, we do not believe that the

installation of ladders in one housing unit and not others constitutes a violation of Agostini's Equal Protection rights.

### B. Constitutional Claims Against Lowe.

Turning to Agostini's constitutional claims against Lowe, Agostini states in his second amended complaint that he is suing all defendants, including Lowe, in both their individual and official capacities.  To the extent that Agostini raises any claims against Lowe in his official capacity, however, such claims should be dismissed.  Because the Supreme Court has held that suing an officer in his or her official capacity is in actuality a suit against the governmental entity that the officer represents, a suit against Lowe in his official capacity would amount to nothing more than a suit against Pike County. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  Since Pike County is already named as a defendant and Lowe, as warden of PCCF, represents the entity of Pike County with which he is employed, a dismissal of any claims against Lowe in his official capacity is appropriate because such claims are redundant.

With respect to individual capacity liability for state actors, such as Lowe, 42 U.S.C. § 1983 "imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or

immunities secured by the Constitution or laws of the United States." *Shuman v. Penn Manor Sch. Dist.,* 422 F.3d 141, 146 (3d Cir. 2005).  Section 1983 "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." *Id.*  To establish a claim under § 1983, the plaintiff must establish a deprivation of a federally protected right and that this deprivation was committed by a person acting under color of state law. *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).  The requirement that a defendant act under color of state law is essential in order to establish a claim under § 1983. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

Although Agostini lists the Fourteenth Amendment as a cause of action, the exact nature of the constitutional claims that Agostini wishes to raise against Lowe is unclear.  Based on the second amended complaint, we observe that Agostini takes issue with Lowe's failure as Warden to provide ladders to Housing Unit-C and also complains that Lowe's responses to some of his grievances were unsatisfactory.[4]  Agostini's allegations, however, fail to state a constitutional claim

---

[4]      In his brief-in-opposition to the dismissal motions, Agostini states that his individual capacity claim against Lowe "ha[s] nothing at all to do with the grievance process or the denial of his grievance."  *Doc. 68* at ¶ 10.  Nonetheless, since Agostini expresses a general dissatisfaction with the grievance process in his second amended complaint, we address the grievance process in this Report and Recommendation.

upon which relief can be granted against Lowe.  First with respect to Agostini's dissatisfaction with the way Lowe responded to his grievances, this fails to give rise to a constitutional claim because "there is no constitutional right to a grievance procedure." *Keeling v. Barrager*, 2014 WL 1338077, at *16 (M.D. Pa. Apr. 3, 2014) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 137-38 (1977)).  Also, "failure to properly process inmate grievances does not form the basis of a constitutional violation." *Id*. (citing *Wilson v. Horn*, 971 F.Supp. 943, 947 (E.D. Pa. 1997)).  Furthermore, to the extent that the grievances Agostini filed pertained to a failure to provide ladders, as previously discussed, a failure to provide such ladders does not amount to a constitutional violation anyway.  Thus, any constitutional claims against Lowe fail to state a claim upon which relief can be granted, and these claims should be dismissed.

### C. Individual Capacity Constitutional Claims Against the Medical Defendants.

With respect to the medical defendants—Prime Care, Nurse Monaghan, Nurse Practitioner Bunting, and Nurse Administrator Goodwin—Agostini raises both individual and official capacity constitutional claims.  We will begin by addressing the individual capacity constitutional claims.

Although the Fourteenth Amendment, rather than the Eighth Amendment, typically applies to complaints by pre-trial detainees, the courts "have found no reason to apply a different standard than the [Eighth Amendment] standard . . . when evaluating whether a claim for inadequate medical care by a pre-trial detainee is sufficient under the Fourteenth Amendment." *Sylvester v. City of Newark*, 120 Fed.Appx. 419, 423 (3d Cir. 2005) (citing *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003)).

In order for a plaintiff to establish a medical-care constitutional claim, he must establish that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *see also Groman v. Township of Manalapan,* 47 F.3d 628, 637 (3d Cir. 1995) ("Failure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs."). Deliberate indifference is a subjective standard. *Farmer v. Brennan*, 511 U.S. 825, 840 (1994). "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney,* 571 F.3d 318, 330 (3d Cir. 2009). To act with deliberate indifference, the prison official must have known of the substantial risk of serious harm and must have disregarded that risk by failing to take reasonable measures to

abate it. *Farmer,* 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The Third Circuit has found deliberate indifference where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999). The Third Circuit has also held that "[n]eedless suffering resulting from the denial of simple medical care, which does not serve any penological purpose . . . violates the Eighth Amendment." *Atkinson v. Taylor,* 316 F.3d 257, 266 (3d Cir. 2003).

At the same time, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as a constitutional claim because medical malpractice is not a constitutional violation. *See Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir. 2004); *Singletary v. Pa. Dep't of Corr.,* 266 F.3d 186, 192 n. 2 (3d Cir. 2002) (claims of medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment). Instead, deliberate indifference represents a much higher standard, one that requires "obduracy and wantonness, which has been likened to

23

conduct that includes recklessness or a conscious disregard of a serious risk."
*Rouse*, 182 F.3d at 197 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)).
"Indeed, prison authorities are accorded considerable latitude in the diagnosis and
treatment of prisoners." *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir. 1993)
(citations omitted).  Furthermore, if a plaintiff's claims amount to a simple
disagreement with medical officials as to the course of treatment, this does not
amount to deliberate indifference. *See Douglas v. Hill*, 1996 WL 716278, at *7
(E.D. Pa. Dec. 6, 1996) (citing *Boring v. Kozakiewicz*, 833 F.2d 468, 473 (3d Cir.
1987)).  Judged against these legal benchmarks, Agostini has failed to state a
constitutional claim against the medical defendants.

### 1.  Constitutional Claims Against Nurse Linda Monaghan

Agostini takes issue with the medical care provided by Nurse Linda
Monaghan immediately after he sustained his fall on September 13, 2014.
Specifically, Agostini alleges that Monaghan failed to use a neck brace when
removing him from the housing unit after his fall and alleges that Monaghan
wrongly failed to order any X-rays or MRIs to further diagnose any potential
injuries Agostini may have had, despite his complaints to Monaghan of severe pain
in his lower back region.  Immediately after Agostini's fall, Monaghan assisted in

his transport from his housing unit, conducted a physical examination, and ordered that Agostini be placed on a lower-tier bunk bed as a result of the examination's findings.  Based on these allegations, however, Monaghan neither exhibited a wanton disregard of Agostini's medical needs nor did she fail to provide any medical treatment.  To the extent that Agostini disagrees with Monaghan's decisions not to use a neck brace or her decision not to order X-rays or MRIs, such disagreement does not give rise to a constitutional claim given the considerable latitude afforded prison authorities in the diagnosis and treatment of prisoners.  Furthermore, to the extent that Agostini believes Monaghan's decisions were negligent, such negligence would be merely malpractice and would not amount to a constitutional violation.

### 2.  Constitutional Claims Against Nurse Practitioner Patty Bunting.

We also conclude that Agostini fails to allege facts to establish a constitutional claim against Nurse Patty Bunting.  Three days after Agostini's fall, Bunting examined Agostini, diagnosed him with "soreness of muscles," and prescribed Tylenol and muscle relaxers.  She also advised Agostini to start walking, and at his request, she also ordered X-rays, which ultimately came back showing no broken bones or other injuries.  Nevertheless, because he was later

diagnosed with sciatica, Agostini takes issue with Bunting's failure to diagnose

him with sciatica and with her prescribing Tylenol and muscle relaxers, which he

alleges did nothing to alleviate his pain.  Agostini's allegations regarding Bunting,

however, raise nothing more than an inference of misdiagnosis and negligent

treatment, neither of which amount to a constitutional violation.  And the fact that

Bunting did not diagnose him earlier was not a violation of constitutional

proportions.

### 3.  Constitutional Claims Against Nurse Administrator Tina Goodwin.

Agostini alleges Goodwin responded to his complaints that Tylenol and

muscle relaxers were not alleviating his pain by telling him that nothing could be

done and that he would have to wait until his follow-up appointment with PA Jenn

Mroz.  Agostini also alleges that he was unsatisfied with the decision of Goodwin

and other medical staff not to send him to the hospital on September 22 after he

allegedly fell due to severe pain in his leg.

Agostini has not, however, alleged sufficient facts to establish that Goodwin

exhibited deliberate indifference.  Based on the facts alleged, the gravamen of

Agostini's claim against Goodwin is that when he told her the Tylenol and muscle

relaxers were not alleviating his pain, she told him he would have to wait until his

next follow-up appointment in order to have his medications changed.  Regarding

delays, deliberate indifference is established when there is a denial or delay of

medical treatment serious enough that it results in "unnecessary and wanton

infliction of pain" or "where denial or delay causes an inmate to suffer a life-long

handicap or permanent loss." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834

F.2d 326, 347 (3d Cir. 1987).  Agostini does not allege that he has suffered a life-

long handicap or permanent loss as a result of any of Goodwin's conduct.  And

while Agostini alleges that he suffered severe pain causing him to black out

subsequent to Goodwin telling him he would have to wait until a follow up

appointment to get his medications changed, there are no allegations that Goodwin

was aware that the pain was this extreme when Agostini previously had informed

her that the Tylenol and muscle relaxers were not working.  Therefore, we would

be hard pressed to conclude that any infliction of pain caused to Agostini by

Goodwin's alleged inaction was "wanton."  Thus, Agostini fails to state a

constitutional claim upon which relief can be granted against Goodwin.

### D. Official Capacity Claims Against the Medical Defendants.

Finally, Agostini brings official capacity *Monell* claims against Monaghan,

Bunting, and Goodwin, as well as against Prime Care.  We conclude that these

claims fail to state a claim upon which relief may be granted.  As *Monell* doctrine generally dictates, private corporations contracted by a prison to provide health care to inmates cannot be held liable on a *respondeat superior* theory alone and can only be held liable if it is shown that there was an established policy or custom of exhibiting deliberate indifference towards inmates' medical needs. *See Natale*, 318 F.3d at 583-84.  Agostini not only fails to allege that the individual nurses acted in accordance with a Prime Care Medical policy, but as we conclude here, he has failed to allege facts from which it can reasonably be inferred that the Prime Care nurses themselves exhibited a deliberate indifference to his medical needs.

### E. Supplemental Jurisdiction Over Agostini's State Law Claims.

Agostini also raises state law claims against the defendants.  We recommend that the court decline to exercise supplemental jurisdiction over Agostini's state law claims in light of our recommendation that all of the federal claims in this action be dismissed.

Whether to exercise supplemental jurisdiction is within the discretion of the court.  28 U.S.C. § 1367(c) (3) provides that district courts may decline to exercise supplemental jurisdiction over a state law claim if the district court has dismissed all claims over which it has original jurisdiction.  When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cahill*, 484 U.S. 343, 350 (1988)).  The Third Circuit has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)).

There is nothing unique about this case such that considerations of judicial economy, convenience, and fairness provide an affirmative justification for exercising supplemental jurisdiction after the court disposes of the federal claims.  Accordingly, we recommend that the court decline to exercise supplemental jurisdiction over the state law claims.

## V.     Conclusion.

Thus, we find that Agostini's second amended complaint fails to state a federal claim as to all of the defendants and that this Court should decline to exercise supplemental jurisdiction over any of his state law claims.

## VI.    Recommendations.

Accordingly, for the foregoing reasons, **IT IS RECOMMENDED** that both motions to dismiss (*Doc. 57* and *Doc. 62*) Agostini's second amended complaint be **GRANTED**; and Agostini's second amended complaint be **DISMISSED.**

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen  (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new

hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this **9th** day of **December 2015**.

**_S/ Susan E. Schwab_**
Susan E. Schwab
United States Magistrate Judge